1
2
3
4
5
6
7
8
## UNITED STATES DISTRICT COURT

9
## SOUTHERN DISTRICT OF CALIFORNIA

10

11  RONALD C. SAVONA,

12                                          Plaintiff,

        vs.
13

14  UNITED STATES OF AMERICA,

15                                          Defendant.

16  UNITED STATES OF AMERICA,

17                          Counterclaim

18  Plaintiff
        vs.
19  RONALD C. SAVONA and KEITH M.
    CHRISTIAN,
20

21                  Counterclaim Defendants.

**CASE NO. 06CV1365 IEG (WMc)**

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT/COUNTERCLAIM PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

(Doc. No. 20, 21, 23, 28, 29, 30)

22          Presently before the Court is Defendant/Counterclaim Plaintiff's motion for summary

23  judgment.  For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART

24  Defendant/Counterclaim Plaintiff's motion.

25                                  <u>BACKGROUND</u>

26  **A.      Factual Background**

27          This matter involves the assessment of civil tax penalties against Ronald C. Savona and Keith

28  M. Christian pursuant to 26 U.S.C. § 6672.

In December 1992, Keith Christian was one of four shareholders that founded Eco Building Systems, Inc. ("Eco").  Eco operated out of Chula Vista, California from approximately 1999 until at least December 2002, manufacturing and selling prefabricated modular buildings, some of which could be used as school classrooms for public school districts and private colleges and universities.

Christian was an employee of the company and a shareholder until December 2002, serving as Chairman of the Board of Directors and President from 1999 until December 2002.  He also served as the CEO from 1999 until December 2001. (Gov. Statement of Facts ISO Motion, Ex. 12, Christian Depo., at 20.)  Christian's job duties from December 2001 until December 2002 involved sales, marketing, raising capital, working with lenders, and working in the accounting and human resources department.  (Id., at 21.)  Christian was authorized to hire and fire employees within his own department.  (Id., at 62.)

Ronald Savona began working for Eco in the spring of 2000 as a Vice President of Manufacturing.  Approximately 6-9 months after he started working at Eco, Savona was promoted to COO and, in December 2001, he became the CEO, replacing Christian.  Throughout these various promotions and changes in job title, Savona's job duties essentially remained constant.  His primary activities related to Eco's manufacturing and construction activities, specifically the manufacturing plant, including purchasing.  He also assisted with sales.  (See Savona Statement of Facts ISO Motion, Ex. 6, Savona Depo., 17-22.)  Like Christian, Savona had the power to hire and fire employees within his department. (Gov. Statement of Facts ISO Motion, Ex. 13, Savona Depo, at 41-42.)  While Savona owned no stock in the company, he did hold stock options.  (Id., at 35)

From at least March 2001 forward, both Christian and Savona were authorized signatories on Eco's various bank accounts and were the only authorized signers on the operating account from which Eco's bills were paid.  (See Gov. Statement of Facts ISO Mot., Ex. 7; Ex. 12, at 49-51; Ex. 13, at 57.)  With respect to the operating account, only one signature was required to issue a check and there were no formal restrictions on either Christian's or Savona's ability to write checks from that account.  (See id.)  Christian was responsible for signing most payroll checks as well as the majority of checks to Eco creditors. (See Gov. Statement of Facts ISO Mot., Ex. 12, Christian Depo., at 60.) Savona was less involved in check writing.  He states he never had access to an Eco checkbook and

1    further asserts that while he may have signed checks on an "emergency" occasion when Christian was

2    not around, he never authorized the payment of Eco's bills and he lacked authority to direct such

3    payments.  (See Savona Statement of Facts ISO Opp., Ex. 6, Savona Depo., at 61, 63, 92-94.)

4         Christian and Savona were both members of Eco's Board from the Fall of 2001 until December

5    of 2002.  (Gov. Statement of Facts ISO Mot., Ex. 13, Savona Depo., at 19, 26.)  Between January 2001

6    and December 2002, Eco's Board held regular quarter meetings which Christian and Savona both

7    attended.  (See id., Ex. 12, at 29, 32; Ex. 13, at 27.)  As early as November 2001, and again on

8    February 29, 2002, Eric Blackhall, a consultant who worked for Eco periodically between November

9    2000 and November 2002, informed the Board of Directors that Eco had outstanding federal payroll

10   taxes that it had not paid.  (Gov. Statement of Facts ISO Mot., ¶ 24.)  Around the same time period,

11   Debt Acquisition Company of America ("DACA"), one of Eco's creditors, sent a demand letter to the

12   company threatening to foreclose if it did not receive payment.  Additionally, Rich Werner—one of

13   Eco's Board members—threatened foreclosure if the company did not pay a note he held against it.

14   Facing pressure from both DACA and Werner, Eco's Board, including Christian and Savona,

15   approved payments to these creditors instead of to the IRS during the first quarter of 2002, as well as

16   in June 2002, and again in August of 2002.  (See id. ¶ 24–27.)  Eco eventually defaulted on the

17   payments of federal withholding taxes for the tax quarters ending May 31, 2001 (the first quarter of

18   2001), May 31, 2002 (the first quarter of 2002), and June 30, 2002 (the second quarter of 2002).

19        On October 13, 2005, a duly authorized delegate of the Secretary of the Treasury made an

20   assessment of liability arising under 26 U.S.C. § 6672 against Savona, alleging a willful failure to

21   collect, truthfully account for, and pay over the withheld income and FICA taxes of Eco.  The IRS

22   made three separate trust fund penalty assessments: (1) a $94,869.01 penalty for the quarter ending

23   May 31, 2001; (2) a $319,777.24 penalty for the quarter ending May 31, 2002; and (3) a $221,258.50

24   penalty for the quarter ending June 30, 2002.  These figures brought the total assessment to $635.905,

25   plus accrued statutory interest and less any payments or credits.  (Def. Mem. ISO Motion, Statement

26   of Facts, ¶ 1.)  On March 29, 2004, a duly authorized delegate of the Secretary of the Treasury made

27   an identical assessment against Counterclaim Defendant Christian.

28        In January of 2006, Savona began to make some payments towards the liability for the above

tax quarters.  Later, in March of that year, Savona requested an abatement of the trust fund recovery assessment against him and the return of his 2006 tax refund, which had been withheld by the IRS in partial satisfaction of the debt.  On or about May 8, 2006, the IRS issued a letter denying Savona's requests.

**B.      Procedural Background**

On July 5, 2005, Savona filed his complaint.  (Doc. No. 1.)  The complaint asserted that the IRS's assessment of tax liability against him was improper since he was neither a responsible person nor willful within the meaning of 26 U.S.C. § 6672.  Savona sought a refund of amounts paid and a full abatement of the assessment against him.  The government filed its answer denying Savona's allegations that the assessment had been improper. (Doc. No. 4.)  In addition, the government asserted counterclaims against Savona and included Christian as a counterclaim defendant for the balance of the tax assessments that remained unpaid. (Id.)  Savona and Christian answered, denying the validity of the government assessments and liability under 26 U.S.C. 6672.  (See Doc. No. 7, Savona Ans., ¶¶ 6-10; Doc. No. 12, Christian Ans. ¶ 6.)

On June 29, 2007, the government filed the present motion for summary judgment on its counterclaims against Savona and Christian.  (Doc. No. 20.)  On July 25, 2007, Savona filed an opposition.  (Doc. No. 21.)  On August 6, 2007, the government filed its reply.  (Doc. No. 23.)  Christian filed his opposition on September 7, 2007, and the government replied on September 11, 2007.  (Doc. No. 28, 30.)  The Court held oral argument on September 24, 2007.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 2000) (recognizing that where material facts are undisputed, the court only decides the application of relevant law).  A dispute is "genuine" when "the evidence presented is such that a jury applying [the appropriate] evidentiary standard could reasonably find for either the plaintiff or the defendant."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

A party seeking summary judgment always bears the initial burden of establishing the absence

- 4 -

of a genuine issue of material fact.  See Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the non-moving party's case, or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  See id. at 322-23.

Once the moving party meets the requirement of Rule 56, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256.  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Id.  Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.  To make such a showing, the non-moving party must go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 325.

## DISCUSSION

### A.      Liability Under 26 U.S.C. §  6672

The Internal Revenue Code requires employers such as Eco to withhold federal social security and income taxes from the wages of their employees.  See 26 U.S.C. §§ 3102(a), 3402(a).  Although an employer collects this money each salary period, payment to the federal government takes place on a quarterly basis.  In the interim, the employer holds the collected taxes in "a special fund in trust for the United States."  26 U.S.C. § 7501(a).  These taxes are known as "trust fund taxes."  See Slodov v. United States, 436 U.S. 238, 243 (1978).  If an employer fails to pay over collected trust fund taxes, "the officers or employees of the employer responsible for effectuating the collection and payment of trust fund taxes who willfully fail to do so are made personally liable to a 'penalty' equal to the amount of the delinquent taxes" under 26 U.S.C. § 6672.  Id. at 244-45.  Section 6672 provides, in relevant part:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax . . . shall . . . be liable to a penalty equal to the total amount of the tax . . . not collected, or not accounted for and paid over.

26 U.S.C. § 6672.  For the purposes of Section 6672, a "person" includes "an officer or employee of a corporation . . . who . . . is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671(b).  Such a person—who by virtue of his status with and authority over a company has a duty to collect, account for, and pay the taxes—is termed a "responsible person."  Alsheskie v. United States, 31 F.3d 837, 838 (9th Cir. 1994).  Thus, an individual is liable for a penalty under Section 6672 if (1) he is a "responsible person"; and (2) if he acts willfully in failing to collect or pay over the withheld taxes.  Davis v. United States, 961 F.2d 867, 869-70 (9th Cir.1992) (citation omitted).

In an action to collect a tax, the government bears the initial burden of proof.  Jones v. United States, 60 F.3d 584, 589 (9th Cir. 1995).  The government can satisfy its burden with the introduction of certificates of assessment and payments, which establish a prima facie case for the United States. Id.; United States v. Stonehill, 702 F.2d 1288, 1293 (9th Cir. 1983) (government can carry its initial burden of proof merely by introducing its assessment of tax due which are entitled to a presumption of correctness when supported by minimal evidentiary foundation).  Next, an individual against whom an assessment is made "bears the burden of proving by a preponderance of the evidence that one or both of [the elements of responsibility and willfulness] is not present."  United States v. Jones, 33 F.3d 1137, 1139 (9th Cir. 1994) (internal quotation and citation omitted) (alteration in original).

**1.     Validity of Assessments**

Savona attacks the assessments in this case, arguing that there is a genuine issue of fact as to whether he was assessed a penalty for any of the taxes at issue within the time period allowed by statute.  Specifically, Savona argues that because the assessment date of October 13, 2005 came more than 3 years after the end of each of the above payroll periods, 26 U.S.C. § 6501(a) bars recovery by the United States.

26 U.S.C. § 6501(a) requires that the tax imposed be assessed "within 3 years after the return was filed."  If the IRS provides notice to the taxpayer in writing that the IRS will be imposing a penalty assessment within the three years statute of limitations, the period is tolled for the latter of (1) the date 90 days after the date on which such notice was mailed or delivered; or (2) if the taxpayer makes a timely protest of the proposed assessment, the date 30 days after the IRS makes a final

1    decision regarding such protest.  See 26 U.S.C. § 6672(b)(3).

2         As discussed above, the relevant tax periods here are: (1) the first quarter of 2001—the payroll

3    period ending March 31, 2001; (2) the first quarter of 2002—the payroll tax period ending March 31,

4    2002, and (3) the second quarter of 2002—the payroll period ending June 30, 2002.  The United States

5    made assessments against Savona with respect to these payroll periods on October 13, 2005 and filed

6    a notice that it was imposing a penalty assessment.  (Gov. Reply ISO Mot., Second Decl. of Jeremy

7    N. Hendon, Ex. 1, pg. 2.)  On December 26, 2003, Savona timely submitted his protest to the proposed

8    assessments.  Therefore, the limitations period would not have run until 30 days after the IRS made

9    its final administrative determination.  26 U.S.C. § 6672 (b)(3)(B).  Savona was notified of the

10   Secretary of the Treasury's final determination on October 6, 2005.  The assessments were made on

11   October 13, 2005.  Thus, because the assessments were made within 30 days of the October 6, 2005

12   notification, the assessments against Savona were timely.  See 26 U.S.C. § 6672(b)(3).

13        **2.     The Responsibility Prong**

14        Next, both Savona and Christian argue that they are not "responsible persons" under section

15   6672.

16        The Ninth Circuit has explained that a person is responsible for the payment of trust fund taxes

17   for purposes of the section 6672 penalty if he had the "final word on which bills should or should not

18   be paid."  Maggy v. United States, 560 F.2d 1372, 1374 (9th Cir. 1997).  "Final word" does not mean

19   "final" but instead means "the authority required to exercise *significant* control over the corporation's

20   financial affairs, regardless of whether the individual exercises such control in fact."  Jones, 60 F.3d

21   at 587 (internal citation and quotation omitted) (emphasis in original).

22        The government relies heavily on the Ninth Circuit's decision in Purcell v. United States, 1

23   F.3d 932 (9th Cir. 1993), for its position that both Savona and Christian are responsible persons.  In

24   that case, a company owner and president named Purcell hired a man named Hatchard to run his

25   company while Purcell focused on non-management activities.  Hatchard embezzled several hundred

26   thousands from the company during his tenure, using a signature stamp bearing Purcell's signature

27   to issue company checks payable to himself.  Hatchard also failed to pay withheld taxes to the IRS for

28   two quarters.  After Hatchard had left the company, the IRS assessed Purcell with the amount of

unpaid withholding taxes for 1981.  Purcell brought an action against the government seeking a refund

of amounts transferred to the IRS in partial settlement of this liability, arguing that because he had

delegated full authority for handling the company's finances to Hatchard and took no active role in

financial matters, he was not a "responsible person" for purposes of § 6672.  The Ninth Circuit

disagreed, noting that the delegation theory pressed by Purcell had been widely rejected.  Instead, the

court explained, an individual's responsibility stems primarily from his/her authority within the

corporation:

> [R]esponsibility is a matter of status, duty, and authority.  Authority turns on
> the scope and nature of an individual's power to determine how the
> corporation conducts its financial affairs; the duty to ensure that withheld
> employment taxes are paid over flows from the authority that enables one to
> do so.  *That an individual's day-to-day function in a given enterprise is
> unconnected to financial decision making or tax matters is irrelevant where
> the individual has the authority to pay or to order the payment of delinquent
> taxes.*

Id. (internal citations and quotations omitted) (emphasis added).  Under this formulation, the court

concluded that given Purcell's status as company president, sole shareholder, and sole authorized

signatory on the company checking account, he qualified as a responsible person.

While the government contends Purcell's language extends liability to any individual who

could theoretically write a check on behalf of a company, as the citations of the Purcell court make

clear, the court was more concerned with an individual's "effective" power and his ability to make

decisions on behalf of the company, not simply his ability to sign a check.  See Purcell, 1 F.3d at 937

("Authority turns on the scope and nature of an individual's power to determine how the corporation

conducts its financial affairs") (citing the following cases:  Raba v. United Sates, 977 F.2d 941, 943

(5th Cir. 1992) ("the crucial examination is whether a person had the 'effective power to pay taxes.'");

Bowlen v. United States, 956 F.2d 723, 728 (7th Cir. 1992) ("the key to liability under section 6672

is the power to control the decision-making process by which the employer corporation allocates

funds"); O'Connor v. United States, 956 F.2d 48, 51 (4th Cir. 1992) (whether a person is responsible

"is considered in light of the person's authority over an enterprise's finances or general decision

making.").).  Indeed the Ninth Circuit has explicitly refused to extend section 6672 liability merely

on the basis of check writing ability.  See United States v. Jones, 33 F.3d 1137 (9th Cir. 1994)

(refusing to extend section 6672 liability to employee of a casino despite employee's check writing

1   authority and his service as general manager, where employee served more in a ministerial capacity
2   and was only authorized to pay creditors approved by his supervisor).

3         Instead, the court has recognized that several factors are relevant to the inquiry of whether an
4   individual is a responsible person. Id. at 1140. Such factors include (1) the individual's duties as
5   outlined in the corporate bylaws; (2) his ability to sign checks; (3) his status as an officer or director;
6   (4) whether he could hire and fire employees; and (5) his discretion over which creditors to pay. Id.
7   (citing Hochstein v. United States, 900 F.2d 543, 547 (2d. Cir. 1990). Other courts have identified
8   additional factors, such as: (6) whether the individual held stock in the corporation, see Greenberg v.
9   United States, 46 F.3d 239, 243 (3d Cir. 1994); and (7) whether the individual's signature is on the
10  employer's federal quarterly and other tax returns. Id.

11              **a.      Are Savona and Christian "Responsible"?**

12                  **i.      Savona**

13        Savona's employment exhibits many of the factors identified above: (1) he had check signing
14  authority (factor 2); (2) he held an office in Eco (though not any stock) (factor 3); and (3) he had the
15  ability to hire and fire employees in his department (factor 4).

16        However, the Court's review of the summary judgment evidence reveals a genuine and heated
17  dispute on the ultimate issue of whether Savona had *significant* control over Eco's financial affairs,
18  including a dispute over a key factor: his authority, if any, to direct payment to creditors of the
19  company. In addition to his own deposition testimony, Savona has put forth evidence from three
20  different Eco employees indicating that it was Christian and not he who had the significant, and in
21  some respects exclusive, authority over financial matters. Specifically, Lisa Marie Parsons, who
22  worked in Eco's accounts payable and payroll departments, testified that Christian "was the only one
23  could make any decisions when it came to any kind of financial spending" and that he had explained
24  to her that he was the only person that she would talk to regarding financial matters and purchases.
25  (See Savona Statement of Facts ISO Opp., Ex. 7, Parsons Depo., at 20-22.) Similarly Robert George
26  Caronna, a manager of field operations at Eco, stated that Christian was the only person who he could
27  go to about financial decisions at Eco. (Savona Statement of Facts ISO Opp., Ex. 8, Caronna Depo.,
28  at 17.) Significantly, Caronna described Savona as operations head, while describing Christian as "the

1   owner in charge" and the person who "we went to [] for any financial needs or anything . . .").  (See

2   id., at 16.)  Finally, Gina Lee Florentino, a marketing and sales specialist with Eco, made similar

3   representations, saying that Savona was not the one to ask about financial decisions, but that such

4   decisions were to be directed at Christian.  (Savona Statement of Facts ISO Opp., Ex. 9, Florentino

5   Depo, at 20-26.)  Even the consultant Blackhall, while asserting that he had seen some checks for

6   creditors signed by Savona, confirmed that 90% of checks were signed by Christian and also testified

7   that Eco's controller Patricia Foster (the one who prepared check, prepared invoices, and who made

8   bank deposits) reported directly to Christian.  Blackhall's testimony also supported Savona's claim

9   that he would direct payment only in "crisis" situations.  (Gov. Statement of Facts ISO Mot., Ex. 14,

10   Blackhall Depo., at 18, 30.)

11        Viewing the evidence in the light most favorable to Savona, as is appropriate at this stage of

12   the proceedings, there is a genuine issue of material fact as to whether Savona had the authority to

13   exercise "significant" control over Eco's financial affairs.  Cf Jones, 33 F.3d at 1141-2 (reversing

14   district court's finding of liability under section 6672 where record did not show that employee had

15   a role in picking certain creditors to pay or otherwise had authority to pay taxes).

16                              ii.      Christian

17        Of the factors identified in this circuit as typical of responsible persons, Christian also exhibits

18   many of the significant factors associated with responsibility: (1) he had the ability to sign checks

19   (factor 2); (2) he served as President and Chairman of the Board (factor 3); (3) he had authority to hire

20   and fire employees (factor 4); (4) he owned stock in the corporation (factor 6); and (5) he signed Eco

21   tax returns (factor 7).   Further there is unchallenged testimony that Christian was ultimately

22   responsible for making financial decisions and directing payment to Eco creditors (factor 5).  Patricia

23   Foster, the Eco employee actually responsible for printing out company checks, stated that it was

24   Christian who selected which bills, out of all those due, which would be paid.  (See Gov. Statement

25   of Facts ISO Mot., Ex. 15, Foster Depo., at 19.)  Blackhall also stated that Christian directed and

26   authorized the payment of bills and that he was the one responsible for the company's financial

27   decisions.  (See id., Ex. 14, Blackhall Depo., at 30, 54.)

28        Christian has offered no significant evidence rebutting any of these statements and instead only

1   attempts to distribute blame to the Board and Savona.  This effort is unpersuasive.  With respect to

2   Christian's attempts to use the Board as a scapegoat, he ignores the obvious purpose of § 6672, which

3   is to authorize the IRS to cut through corporate identities and to assess civil penalties directly against

4   responsible corporate officers.  As to Savona, Christian fails to recognize that, under § 6672, liability

5   may extend to more than one corporate officer.   USLIFE Title Ins. Co. of Dallas v. Harbison, 784

6   F.2d 1238, 1243 (5th Cir. 1986) ("The fact that more than one person is responsible for a particular

7   delinquency does not relieve another responsible person of his or her personal liability, nor can a

8   responsible person avoid collection against himself on te ground that the Government should first

9   collect the tax from someone else."); Hartman v. United States, 538 F.2d 1336, 1340 (9th Cir. 1976)

10  (two or more persons may be jointly and severally liable under section 6672).

11          Because he fails to point to specific facts refuting the evidence above, the Court finds Christian

12  has failed to raise a genuine issue of material fact as to whether he had significant control over the

13  financial affairs of Eco.  The Court therefore deems Christian a "responsible" person under section

14  6672 with respect to the tax assessments issued to him on March 29, 2004.

15          **3.     The Wilfulness Prong**

16          Willfulness, under § 6672, has long been defined as "a voluntary, conscious and intentional

17  act to prefer other creditors over the United States."  Purcell, 1 F.3d at 938 (quoting Davis, 961 F.2d

18  at 871).  Willfulness does not require the intent to defraud the government or any other bad motive.

19  Davis, 961 F.2d at 871.  "Once a responsible person gains knowledge of a payroll tax deficiency, he

20  is liable for all periods during which he was a responsible party, regardless of whether those periods

21  precede or follow the date he gained that knowledge."  Schlicht v. United States, 2005 WL 2083103,

22  *4 (D. Ariz. August 25, 2005) (citing Davis, 961 F.2d at 873).  Accordingly, a deliberate decision to

23  use corporate funds after receiving knowledge of a payroll tax deficiency "falls within the literal terms

24  of this Circuit's definition of willfulness."  Davis, 961 F.2d at 871; see also Thomsen v. United States,

25  887 F.2d 12 (1st Cir.1989) (holding that once a person is aware of the liability to government, that

26  person has a duty to ensure that the taxes are paid before any payments are made to other creditors

27  (citing Mazo v. United States, 591 F.2d 1151, 1157 (5th Cir.1979)).

28  //

1  //

2  **a.      Were Savona and Christian Willful?**

3  **i.      Savona**

4  Because the Court determines that there is a genuine issue as to whether Savona is a

5  responsible person—i.e. whether he had authority to prefer certain creditors over the United

6  States—the Court necessarily finds a genuine issue as to whether Savona willfully preferred such

7  creditors.

8  **ii.      Christian**

9  Christian argues that he did not act voluntarily when paying creditors instead of the

10  government because it was the Board of Eco which ultimately authorized and directed payments, even

11  though actual checks were issued by either him or Savona.  Christian says that it was the Board that

12  voted to prefer creditors over the IRS due to the strong influence of specific board members.  He

13  further asserts that his conduct cannot be deemed willful because he was under significant duress,

14  since signing a check to the IRS instead of Eco creditors would have resulted in the loss of his home,

15  his minority equity share, and the money he had loaned to Eco.

16  Christian was undisputably aware of the unpaid employment taxes when Eco used

17  unencumbered funds to pay DACA in June 2002 and August 2002.  Once Christian became aware of

18  the tax deficiency, he failed to ensure payment in full of that deficiency before any other creditors

19  were paid.  The law is clear that such a failure is willful and subjects the responsible person to § 6672

20  penalties.  See Schlicht, 2005 WL 2083103, at *4.  Christian has presented this court with no authority

21  for his assertion that liability does not attach where a Board directs a responsible corporate officer to

22  prefer creditors to the IRS nor for his claim that economic pressure may his noncompliance.

23  //

24  //

25  //

26  //

27  //

28  //

06cv1365

1

## <u>CONCLUSION</u>

2          Based on the foregoing, the Court DENIES the government's motion for summary judgment

3    with respect to counterclaim defendant Savona.  The Court GRANTS summary judgment with respect

4    to counterclaim defendant Christian.  The Court finds Christian liable for the balance of the total

5    assessment, $635.905, plus accrued statutory interest and less any payments or credits.

6

7    **IT IS SO ORDERED.**

8

9    **DATED:  October 15, 2007**

10                                        _Irma E. Gonzalez_

11                                        **IRMA E. GONZALEZ, Chief Judge**
                                          **United States District Court**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

06cv1365